**PROFESSIONAL SERVICE INDUSTRIES, INC.,**
Plaintiff,

v.

**W. David KIMBRELL and Janet Kimbrell, Defendants.**

No. 90–1326–MLB.

United States District Court, D. Kansas.

Sept. 8, 1993.

---

**20.** The arguments regarding the Kansas claims are found in Doc. 235, pp. 55–57 and Doc. 266, pp. 54–57.

William A. Bonwell, Jr., Susan Ellis, Bonwell, Foster, Borniger & Ellis; William R. Smith, Hershberger, Patterson, Jones & Roth; David E. Bengtson, Morrison & Hecker, Wichita, KS; Christopher L. Vescovo, John J. Thomason, Jerry E. Mitchell and Buckner P. Wellford, Thomason, Hendrix, Harvey, Johnson & Mitchell, Memphis, TN, for plaintiff/counter defendant/third-party defendants.

Paul L. Thomas, Wichita, KS, John J. Jurcyk Jr., McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, John D. Petersen, Polsinelli, White, Vardeman & Shalton, Overland Park, KS, and Dennis J. Dobbels, and David A. Welte, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, for defendants/counterclaimants/third-party plaintiffs.

Barbara K. Huff, Lawrence, KS, for objector.

### MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on the defendants' motion for summary judgment on Professional Service Industries, Inc.'s (PSI) common law claims, pursuant to Fed. R.Civ.P. 56. (Doc. 475)

David and Janet Kimbrell were the majority stockholders of Hall–Kimbrell Environmental Services, Inc. (Hall–Kimbrell), an environmental engineering corporation headquartered in Lawrence, Kansas. PSI approached the Kimbrells in the fall of 1989 about the possibility of PSI purchasing the stock of Hall–Kimbrell. Negotiations ensued and the parties ultimately executed a stock purchase agreement on December 29, 1989, whereby the Kimbrells, along with the other shareholders of Hall–Kimbrell, sold their stock to PSI.

Commencing in March, 1990, the Environmental Protection Agency (EPA) filed numerous complaints against Hall–Kimbrell. The complaints centered on Hall–Kimbrell's failure to inspect wallboard for asbestos in schoolbuildings it had contracted to inspect. PSI thereafter brought suit against the Kimbrells, alleging securities fraud, common law fraud, breach of contract, deceit, negligent misrepresentation, civil conspiracy, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing. In a separate opinion (Doc. 510), the court granted the Kimbrells' motion (Doc. 234) for partial summary judgment on PSI's securities fraud and common law fraud claims. In this motion, the Kimbrells seek summary judgment on PSI's claims of deceit, negligent misrepresentation, civil conspiracy, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing and breach of contract.

### STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c).

### DISCUSSION

*Deceit*

The Kimbrells argue that no independent cause of action for deceit exists, but rather, is

subsumed within the cause of action for fraud. In support of their argument, they point to the Kansas Supreme Court's statement that "fraud includes anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence resulting in damage to another." *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 465, 738 P.2d 1210 (1987).

The court's research discloses no Kansas case recognizing deceit as a cause of action separate and distinct from fraud. The court finds it instructive, however, to compare the elements of deceit cited by PSI in its response with the elements of fraud. PSI lists the elements of deceit as:

1. A false representation made by the defendant ...

2. Knowledge or belief on the part of the defendant that the representation is false— or, what is regarded as equivalent, that he has not a sufficient basis of information to make it ...

3. An intention to induce the plaintiff to act or refrain from action in reliance upon the misrepresentation.

4. Justifiable reliance upon the representation on the part of the plaintiff, in taking action or refraining from it.

5. Damage to the plaintiff, resulting from such reliance. (Doc. 496, pp. 27–28)

On the other hand, actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, which is made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his or her injury and damage. *Albers v. Nelson*, 248 Kan. 575, 579, 809 P.2d 1194 (1991) (Citation omitted).

The court agrees with the Kimbrells' argument. A comparison of the elements of deceit and fraud indicates the two terms are synonymous. There is no separate cause of action for deceit under Kansas law. It is encompassed within a fraud claim.

Summary judgment is granted to Kimbrells on PSI's claim of deceit.

## Negligent Misrepresentation

Although not specifically stated in the amended complaint, the court construes PSI's amended complaint to allege the same conduct underlying its fraud claim also supports a claim of negligent misrepresentation. This conduct consists of Kimbrells' alleged failure to inform PSI of the likelihood of impending EPA action against Hall–Kimbrell, as well as Kimbrells' use of allegedly misleading financial statements during the negotiations. Kimbrells contend any duty they may have had concerning the representations allegedly made during the negotiations leading up to the contract is not actionable under a negligent misrepresentation theory.

Before addressing the merits of the respective legal arguments, it is immediately apparent that there is no factual support for PSI's claim against Janet Kimbrell. The uncontroverted facts establish that Janet Kimbrell did not participate in the negotiations and made no representations to PSI. Her silence cannot support a claim for negligent misrepresentation.

The Stock Purchase Agreement provided in relevant part:

This instrument, together with the Schedules annexed hereto, contains the entire agreement of the parties relating to the subject matter hereof, and the parties hereof have no agreements, representations or warranties relating to the subject matter of this Agreement which are not set forth herein.

Kimbrells contend this specific disclaimer of prior representations and warranties renders a negligent misrepresentation claim unavailing.

The Tenth Circuit addressed an analogous issue in *Isler v. Texas Oil & Gas Corp.*, 749 F.2d 22 (10th Cir.1984). In *Isler*, the defendant owned an oil and gas lease that it farmed out to the plaintiff. The plaintiff later brought an action seeking to recover for the defendant's failure to make necessary rental payments which resulted in the expiration of the lease. The trial court entered judgment for the plaintiff on a negligence theory. The Tenth Circuit reversed. Rely-

ing upon the New Mexico Supreme Court's decision in *Rio Grande Jewelers Supply, Inc. v. Data General Corporation*, 101 N.M. 798, 689 P.2d 1269 (N.M.1984), the court found the jury's verdict infringed on the principle of freedom of contract, whereby parties bargain and voluntarily impose upon themselves certain duties and the consequences of the breach of those duties. *Id.* at 23. The court found the trial court had confused the concept of contractual duties with tort duties. The former duties are voluntarily bargained for, while the latter duties are imposed by law on individual members of society without their consent. Applying those concepts to the case before it, the court held that any extracontractual tort duty regarding rental payments and notice was precluded because the contract specifically defined the rights and duties of the parties. *Id.* at 24.

The Kansas Supreme Court embraced the reasoning of *Isler* in *Ford Motor Cred. Co. v. Suburban Ford*, 237 Kan. 195, 699 P.2d 992 (1985). In *Ford Motor*, the plaintiff sued the defendant for breach of contract. The defendants counterclaimed on a number of tort theories. Relying upon *Isler*, the Supreme Court held the submission to the jury of any tort claim for conduct by the defendants expressly allowed by the parties' contract was erroneous, as the parties' relationship was governed by their contract. *Id.* at 203–05, 699 P.2d 992.

The court finds that the reasoning articulated in *Isler* and *Ford Motor Credit* is applicable to this case as well. The above quoted language of the Stock Purchase Agreement contains an integration clause expressly disclaiming all prior representations. The alleged negligent misrepresentations are the same representations upon which PSI's breach of contract claim is based. The court shares the view articulated by Judge Crow in *Ritchie Enterprises v. Honeywell Bull, Inc.*, 730 F.Supp. 1041 (D.Kan.1990), that "[T]he Kansas Supreme Court cannot logically espouse the expansive reasoning in *Isler* without sometime later also adopting its conclusion that a negligence claim cannot be main-

tained on the same conduct governed by the parties' contract which specifies the consequences of such a breach." *Id.* at 1051.[1]

Kimbrells' motion for summary judgment on PSI's negligent misrepresentation claim is granted.

*Civil Conspiracy*

█ PSI alleges that David and Janet Kimbrell's actions constitute a civil conspiracy. The elements of civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or cause of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof. *Stoldt v. City of Toronto*, 234 Kan. 957, 967, 678 P.2d 153 (1984).

█ PSI has produced no evidence by which a reasonable factfinder could find the existence of a civil conspiracy. It is firmly established that a party cannot avoid summary judgment by merely relying on its pleadings, but must set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 726 (10th Cir.1991). PSI makes only conclusory and unsupported assertions to support its claim. For example, it baldly alleges, based on the Kimbrells' marital status, that Janet Kimbrell had almost constant access to her husband. PSI also points to Janet Kimbrell's status as an officer or director and asserts this creates a question of fact as to her knowledge.

█ The court finds these assertions are plainly insufficient to survive a motion for summary judgment. In fact, they amount to no more than speculation on PSI's part. The court will not infer an agreement among persons simply by virtue of a marital relationship.

The Kimbrells' motion for summary judgment on PSI's civil conspiracy claim is granted.

---

1. The *Ritchie* court also held that the plaintiff's negligent misrepresentation claims must be dismissed on the basis that a negligence action is unavailable if only economic losses are sought and that any liability and damages are dictated by contract principles. 730 F.Supp. at 1052 (Citations omitted).

*Breach of Fiduciary Duty*

In its response, PSI concedes it has no claim for breach of fiduciary duty. Accordingly, judgment is granted to the Kimbrells on this claim.

*Breach of the Implied Covenant of Good Faith and Fair Dealing*

██ Under Kansas law, every contract carries an implied duty of good faith and fair dealing. *Daniels v. Army Nat'l Bank,* 249 Kan. 654, 658, 822 P.2d 39 (1991). PSI alleges the Kimbrells breached this duty by concealing and misrepresenting the value of their Hall–Kimbrell stock and the imminent EPA action. Additionally, PSI alleges David Kimbrell's disruptive behavior following the sale supports such a claim.

██ PSI's allegations are defective. First, the implied covenant of good faith and fair dealing applies to the *performance* of a contract, not to its formation. *See Bonanza, Inc. v. McLean,* 242 Kan. 209, 221–22, 747 P.2d 792 (1987). Thus, PSI's allegations pertaining to conduct occurring *prior* to the formation of the contract cannot be actionable under this theory. Second, PSI makes no mention in its amended complaint of David Kimbrell's conduct occurring after the formation of the contract. Rather, their complaint references conduct leading up to the Stock Purchase Agreement. The court agrees with Kimbrells that David Kimbrell's conduct following the execution of the Stock Purchase Agreement is not alleged in Count III of PSI's amended complaint and must be dismissed.

*Breach of Contract*

██ Kimbrells argue that under Kansas law, a purchaser of securities cannot hold the seller liable for breach of the representations and warranties provision of the contract when the purchaser did not rely on the seller's representations. Kimbrells contend the undisputed facts establish that PSI did not rely any representation made by them. PSI responds that reliance is not a necessary element for a cause of action for breach of an express warranty under Kansas law.

In *Land v. Roper Corp.,* 531 F.2d 445 (10th Cir.1976), the purchaser of all of the stock of a corporation sued the seller for breach of express warranty and sought either rescission or damages. At the conclusion of the trial, Judge Wesley Brown of this court instructed the jury that reliance was an essential element of a breach of express warranty claim and that if the purchaser had not relied on the warranties given by the seller, then the jury was to return a verdict in favor of the seller. After the jury verdict, the trial court entered judgment for the seller, and the purchaser appealed.

The primary issue on appeal was whether, under Kansas law, reliance was a necessary element in an action for a breach of express warranty. The court found that Kansas law on the question of reliance was unsettled, but found dicta in several cases suggesting that reliance was required. *Id.* at 448. The court also noted that the Sales Act, which was in effect prior to the adoption of the Uniform Commercial Code, prescribed reliance as a necessary element. The court found it reasonable to infer that such a reliance requirement also extended to the transfer or sale of securities. *Id.* Accordingly, the court held the trial court was correct in ruling that reliance was an essential element of a cause of action for breach of express warranty. *Id.* at 449.

In *Young & Cooper, Inc. v. Vestring,* 214 Kan. 311, 521 P.2d 281 (1974), the Kansas Supreme Court held that reliance was not an element for breach of express warranty under the Uniform Commercial Code (UCC), K.S.A. 84–2–313(1)(a). *Id.* at 324. The Court found that affirmations of fact made by the seller about the goods are regarded as part of the description of those goods, and therefore no particular reliance on such statements is necessary.[2] *Id.*

More recently, Judge Van Bebber applied the rule from *Young & Cooper* to deny a motion for summary judgment by an asbes-

---

**2.** The Supreme Court cited *Topeka Mill & Elevator Co. v. Triplett,* 168 Kan. 428, 213 P.2d 964 (1950) for this proposition. The Tenth Circuit, on the other hand, cited *Topeka Mill* for the proposition that reliance *is* necessary. The Tenth Circuit did not cite *Young & Cooper* in its opinion.

tos manufacturer on a breach of express warranty claim. *Unified School Dist. No. 500 v. U.S. Gypsum Co.*, 788 F.Supp. 1173, 1177 (D.Kan.1992); *but see Owens–Corning Fiberglas v. Sonic Dev. Corp.*, 546 F.Supp. 533, 541 (D.Kan.1982) (citing *Roper*, court holds that in Kansas, it is necessary to prove both that an express warranty was made, and that it was relied upon by the buyer).

Kimbrells argue that the reliance requirement of *Young & Cooper* applies only to transactions arising under the UCC. For transactions outside the sale of goods context, such as the case at bar, they contend *Roper* is controlling. Kimbrells correctly note that *Roper* was decided after *Young & Cooper*, which tends to indicate the Tenth Circuit was cognizant of *Young & Cooper* and intended a different rule to apply outside the sale of goods context.

The reasoning of *Roper* is difficult to reconcile with *Young & Cooper*. The Tenth Circuit notes the existence of a reliance requirement in the Sales Act, and infers this requirement would be extended to the sale of securities. Yet the law in effect at the time *Roper* was decided was the UCC, and the Kansas Supreme Court had interpreted the UCC's breach of express warranty provision to eliminate the element of reliance. Thus, the Tenth Circuit's reasoning appears to be at odds with the Kansas Supreme Court's conclusion in *Young & Cooper*.

The Tenth Circuit, however, offered an additional rationale for its decision. It noted that Kansas recognized a cause of action for innocent misrepresentation made without negligence. This cause of action contained a reliance requirement. 531 F.2d at 448. The court found a cause of action for breach of express warranty was similar to a non-negligent or non-intentional misrepresentation claim. *Id.* at 449. Accordingly, it concluded that a breach of express warranty claim also contains a reliance requirement. *Id.*

This court is bound to follow the decisions of the Tenth Circuit. However, under the *Erie* doctrine, the Kansas Supreme Court's interpretation of Kansas law is definitive. The court is persuaded that *Young & Cooper* can be distinguished as being applicable only to transactions arising under the UCC, and

that *Roper* controls our decision. Thus, PSI must prove the element of reliance to recover under a breach of express warranty theory.

The court finds support for its conclusion in *Hendricks v. Callahan*, 972 F.2d 190 (8th Cir.1992). In *Hendricks*, the purchaser of stock sued the seller under several theories, including breach of express warranty. The trial court granted summary judgment to the defendant, concluding that Minnesota law required a party alleging a breach of express warranty to have relied on that warranty when making the contract. *Id.* at 192. The Eighth Circuit affirmed.

The plaintiff argued that Minnesota's adoption of the UCC had abrogated the existing common law requirement that a buyer rely on an express warranty. The court rejected plaintiff's argument by noting the transaction at issue was not a transaction in goods and therefore not covered by the UCC. *Id.* at 193. The court additionally found that although reliance was not listed as an element of a breach of warranty claim by the Minnesota Supreme Court, the existence of an express warranty required the warranty to be the "basis of the bargain". *Id.* at 194. The court held

> In sum, because this transaction is not governed by the UCC, because *Peterson* [*v. Bendix Home Systems*, 318 N.W.2d 50 (Minn.1982)] and its progeny are UCC cases, because the Minnesota Supreme Court has affirmed the use of jury instructions which require reliance in a related context, and because the Minnesota Supreme Court has not expressly overruled *Midland* ... appellants must show some form of reliance on the warranty to succeed.

*Id.* at 194—95.

*Hendricks* supports the view that breach of express warranty claims involving transactions arising outside the sale of goods context require reliance.

 Kimbrells argue that PSI cannot prove it relied on any warranties given by them. The court agrees. First, with respect to PSI's allegation that Kimbrells failed to inform it of impending action by the EPA, PSI was fully aware of this possibility prior to the consummation of the Stock Purchase

Agreement. The undisputed facts establish that PSI's asbestos coordinator, Margaret Maninger–Brown, was informed by Harry Angelos, an EPA employee, in November, 1989 that Hall–Kimbrell's management plans were not in compliance with EPA regulations and that "there were a lot of them." Angelos informed Maninger–Brown that the EPA planned to take action against Hall–Kimbrell. Maninger–Brown did not think that Angelos was responsible for determining compliance; rather, the advice was offered out of Angelos' concern that " . . . PSI was going to become involved with a company which had not done things correctly and which had incurred terrible liabilities, that would affect PSI very badly." Maninger–Brown already shared this concern. "The . . . information from the EPA simply solidified the alarm that I felt at taking on that kind of organization." Maninger–Brown relayed her concern to Mark Weiland, PSI's chief counsel, who told her to talk with Powers. Maninger–Brown told Weiland that from her knowledge " . . . when I was doing field work and from friends in the field, that it—Hall–Kimbrell was not the great asbestos guru that it thought it was, that in fact, very often they did shoddy work, but they put out good looking slick reports; that now I'd heard from the EPA that there were a number of management plans in trouble." Then, sometime between the end of November and mid-December, 1989, Maninger–Brown gave the same information to Tom Powers,[3] who said he would "look at it". Powers confronted David Kimbrell with the information on December 22, 1989. Kimbrell assured Powers the problems were "insignificant".

The court finds as a matter of law that PSI's reliance, if any, on Kimbrell's assurances was not reasonable. PSI is a large corporation with a high degree of business sophistication. Like Hall–Kimbrell, it generated millions of dollars of revenue from its asbestos business. It is reasonable to assume PSI has a considerable knowledge of the EPA's regulation of the asbestos business and there is no evidence to the contrary. In the face of unmistakable warnings from an EPA employee that adverse action would be taken against Hall–Kimbrell, PSI chose to disregard Angelos' warnings, as well as those of its own asbestos coordinator, and believe Kimbrell. Particularly in the context of a stock transaction worth tens of millions of dollars, a sophisticated purchaser must be expected to pay greater attention to such obvious warning signals.

PSI continues to point to the existence of a private placement memorandum (PPM), to support its contention that the Kimbrells deliberately withheld material information from it. The PPM was prepared in connection with Hall–Kimbrell's effort to sell preferred stock in November, 1988, and stated in part:

> Hall–Kimbrell may have potential liability to numerous clients should it fail to comply with not only the contractual obligations but federal laws and regulations, particularly AHERA [4] and numerous state regulations relating to asbestos handling, abatement, surveying, and submission of reports. Hall–Kimbrell undertook to submit numerous AHERA management plans to school clients in order for the clients to meet the October 12, 1988 deadline for submission of such plans to State agencies. The failure of any such AHERA management plan to conform to regulatory requirements may expose the Company to potential responsibility to perform additional work without additional compensation, potential contractual damage claims and regulatory fines. Such claims may have a material adverse effect on the Company.

PSI had knowledge of all of the information contained in the PPM from other sources *prior* to the consummation of the Stock Purchase Agreement. Because of its major involvement in the asbestos business, it is surprising for PSI to feign a lack of awareness that failure to comply with EPA regulations could subject a company to adverse financial consequences. In this case, PSI possessed specific information about Hall–Kimbrell's problems with the EPA that transcended the general caveats in the PPM.

---

**3.** PSI's executive vice-president.

**4.** Asbestos Hazard Emergency Response Act, 15 U.S.C. § 2641 *et seq.*

The PPM therefore does not serve to raise any disputed issue of material fact.

■ Second, with respect to PSI's allegation that Kimbrells provided false financial information, the facts are undisputed that PSI did not rely on the information David Kimbrell provided (or, to the extent it did, its reliance was unfounded). In fact, PSI conducted its own review of Hall–Kimbrell's financial records and knew Hall–Kimbrell was losing money—$1.3 million in the first eleven months of 1989. PSI's retained accountant, Jerry Armstrong, wrote a report to PSI after conducting a due diligence review of Hall–Kimbrell's financial records and stated that Hall–Kimbrell's financial projections were extremely aggressive and "do not appear reasonable." Powers concedes in his deposition that he knew prior to the sale that there was a "substantial variance" between the financial information David Kimbrell provided and the actual financial performance of Hall–Kimbrell. Powers even admits David Kimbrell told him in a September 27, 1989 meeting that the financial information Kimbrell was providing overstated revenues by approximately $5 million. Powers testified he considered this "almost unethical."

In sum, it is patently apparent that PSI did not rely on the accuracy of the financial statements and projections provided by Kimbrells, as alleged in its amended complaint. Rather, PSI had the opportunity and in fact conducted an extensive investigation that contradicted the information it now alleges it reasonably relied upon. The court finds as a matter of law that PSI cannot prove the element of reliance on its breach of contract claim.

IT IS THEREFORE ORDERED that Kimbrells' motion (Doc. 475) for summary judgment on PSI's common law claims in Count III of the amended complaint in hereby granted. Any motions for reconsideration of this order shall be limited to 15 pages. Responses and replies shall be limited to 10 and 5 pages, respectively. All page limits include attachments and appendices.